UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDREW E. ROTH,

                Plaintiff,

       -against-

ARMISTICE CAPITAL, LLC, ARMISTICE
CAPITAL MASTER FUND LTD., and STEPHEN J.
BOYD,

                Defendants,

       -and-

VAXART, INC.,

                Nominal Defendant.

Case No. 1:20-cv-08872 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

        Andrew E. Roth ("Plaintiff") brings this action under Section 16(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b) ("Section 16(b)").  ECF No.

1 (the "Complaint" or "Compl.") ¶ 1.  Plaintiff, proceeding on behalf of nominal defendant

Vaxart, Inc. ("Vaxart"), seeks disgorgement of short-swing profits allegedly obtained by

Armistice Capital, LLC ("Armistice Capital"), Armistice Capital Master Fund Ltd. (the

"Master Fund" and, together with Armistice Capital, "Armistice"), and Stephen J. Boyd

(together with Armistice, "Defendants").  *Id.* ¶¶ 1-7.  Defendants have moved for summary

judgment under Federal Rule of Civil Procedure ("Rule") 56.  ECF No. 106 ("Br.").  For the

following reasons, Defendants' motion is GRANTED.

## BACKGROUND

### I.   Facts

Except where noted, the following facts are undisputed.[1]   The Court draws "all

justifiable inferences" in favor of Plaintiff as the party opposing summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] At the outset, the Court addresses the consideration of certain evidence submitted by Defendants.  In late October and early November 2022, counsel for Vaxart interviewed five current and former members of Vaxart's board of directors: Todd Davis, Michael Finney, Andrei Floroiu, Walter Latour, and Anne VanLent.  After each interview, counsel drafted a memorandum summarizing the interviewee's statements.  ECF Nos. 107-4 through 107-8.  Months later, Davis, Finney, Floroiu, and VanLent executed declarations stating that each had "reviewed the memorandum of th[e] interview," that "[t]he memorandum accurately reflects what [the interviewee] conveyed" during the interview, and that "[t]he information contained in the memorandum further accurately reflects [the interviewee's] recollection of the events and topics described therein."  ECF No. 107-4 at 2-3; ECF No. 107-5 at 2-3; ECF No. 107-6 at 2-3; ECF No. 107-8 at 2.  Latour did not execute a similar declaration.  *See generally* ECF No. 107-7.

Plaintiff argues that all of the interview memoranda "are inherently untrustworthy as hearsay."  ECF No. 118 at 23 n.13 (citing Fed. R. Evid. 801).  Defendants disagree, contending that because the directors "reaffirmed the statements in the memoranda in sworn declarations," the statements are "admissible as evidence on summary judgment."  ECF No. 125 at 6.

The Davis, Finney, Floroiu, and VanLent declarations – which effectively ratify, adopt, and incorporate the contents of their respective interview memoranda – "are in fact based on personal knowledge and perceptions and therefore properly [a]re considered" on summary judgment.  *Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir. 1993); *see Choleva v. New Eng. Stair Co.*, No. 18-cv-00756, 2020 WL 3976969, at *2 n.4 (D. Conn. July 14, 2020) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, the material may be presented in a form that would not, in itself, be admissible at trial." (brackets omitted) (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2722 (4th ed.))).  Conversely, the Latour memorandum lacks any such accompanying declaration.  It amounts to "[a]n attorney's affidavit . . . not based on personal knowledge of the relevant facts," so the Court "accord[s] [it] no weight."  *Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 213 (S.D.N.Y. 2002).

The Court notes that even if it did not consider any of these declarations and interview memoranda, its ultimate decision would be the same due to the other evidence in the record, including the Rule 30(b)(6) testimony of Robert Yedid.

Vaxart is a publicly traded biotechnology company that seeks to develop vaccines administered through tablets instead of injections. ECF No. 111 ("JSOF") ¶ 1. Its common stock is registered under Section 12(b) of the Exchange Act and traded on the NASDAQ. *Id.*

Armistice Capital is a Delaware limited-liability company and a registered investment advisor with its principal place of business in New York. Compl. ¶ 3; ECF No. 61 ("Ans.") ¶ 3. The Master Fund is an executed company organized under the laws of the Cayman Islands; it maintains a mailing address at Armistice Capital's New York office. Compl. ¶ 4; Ans. ¶ 4. Armistice Capital does not trade any securities for its own account. ECF No. 109 ("Boyd Decl.") ¶ 3. Instead, Armistice Capital provides investment-management services to private-investment funds, including the Master Fund. Compl. ¶ 3; Ans. ¶ 3; ECF No. 127 ("Defs. RSOF") ¶ 49. All trading by Armistice Capital in Vaxart securities was done on behalf of the account of the Master Fund, Boyd Decl. ¶ 3, although Defendants "do not dispute that Armistice Capital and Mr. Boyd were beneficial owners of the Vaxart common stock held in [the] Master Fund's account," Defs. RSOF ¶ 51.

Boyd founded both Armistice Capital and the Master Fund in 2012. Boyd Decl. ¶ 1. He is Armistice Capital's managing member and chief investment officer. *Id.* ¶ 3. He is also a director of the Master Fund, and he directs all trades for securities held in the Master Fund's account. Defs. RSOF ¶ 50. As Armistice Capital's chief investment officer, Boyd possessed and exercised control and decision-making authority over all aspects of Armistice's Vaxart investment, including all voting and investment decisions. ECF No. 119 ("Pl. RSOF") ¶¶ 16-17.

On April 11, 2019, Armistice acquired 4,090,909 warrants from Vaxart at an exercise price of $1.10 per share set to expire on April 11, 2024. JSOF ¶ 2; *see* ECF No. 107-10 (the "$1.10 Warrant"). The $1.10 Warrant stated that the "[e]xercise of the purchase rights

represented by this Warrant may be made, in whole or in part, at any time or times [before the expiration date] by delivery to [Vaxart] of a duly executed facsimile copy (or e-mail attachment) of the Notice of Exercise in the form annexed hereto."  $1.10 Warrant § 2(a).  The $1.10 Warrant also contained a "beneficial ownership limitation" provision, otherwise known as a "blocker" provision.  JSOF ¶ 4 (capitalization omitted).  This provision stated that Armistice could not exercise its right to purchase Vaxart common stock if doing so would result in Armistice owning more than 4.99 percent of the outstanding shares of Vaxart common stock.  $1.10 Warrant § 2(e).

On September 30, 2019, Armistice acquired 16,666,667 warrants from Vaxart at an exercise price of $0.30 per share set to expire on September 30, 2024.  JSOF ¶ 5; *see* ECF No. 107-12 (the "$0.30 Warrant" and, together with the $1.10 Warrant, the "Warrants").  The provision in the $0.30 Warrant governing Armistice's exercise of its right to purchase Vaxart stock was materially the same as the provision in the $1.10 Warrant, except the $0.30 Warrant's blocker provision set a beneficial-ownership limitation of 9.99 percent (rather than 4.99 percent, as in the $1.10 Warrant).  *Compare* $0.30 Warrant § 2(e), *with* $1.10 Warrant § 2(e).

On October 2, 2019, Dr. Wouter Latour, then serving as Vaxart's chief executive officer, sent an email to Boyd congratulating him on Armistice's substantial position in Vaxart (which, at that time, included not only the Warrants but also 24,000,000 shares of common stock).  ECF No. 107-14; JSOF ¶ 8; Boyd Decl. ¶ 20; *see* Defs. RSOF ¶ 53 (as of October 2019, Armistice owned as much as 65.2 percent of Vaxart's outstanding common stock); Pl. RSOF ¶ 1 (same).  Boyd and Latour spoke on a call on October 4, 2019, during which Boyd requested board seats for himself and Dr. Keith Maher, managing director of Armistice Capital.  Defs. RSOF ¶¶ 57-58; Boyd Decl. ¶ 21; ECF Nos. 107-1, 122-5, 126-1

(collectively, "Yedid Dep.") at 74:6-75:2.[2]  During subsequent discussions with Latour, Boyd also suggested that Vaxart increase the size of its board of directors (the "Vaxart Board" or the "Board") from six to eight, and that Vaxart appoint Todd Davis and Robert Yedid to fill the added seats.  Defs. RSOF ¶ 58; Yedid Dep. at 74:22-23.

When deciding whether to add Boyd and Maher as directors, Vaxart and its Board knew that Armistice owned a majority of Vaxart's shares, that Boyd was Armistice's chief investment officer, and that Maher was also affiliated with Armistice.  Yedid Dep. at 75:4-76:15.  Indeed, the Vaxart Board considered adding Boyd and Maher as directors "*because of* Mr. Boyd and Dr. Maher's affiliation with Armistice."  *Id.* at 72:16-19 (emphasis added); *accord* ECF No. 107-5 ("Finney Memo") at 6 ("[W]ithout Armistice holding those shares, [Vaxart] would not have asked Messrs. Boyd and Maher to be Board members.").

On October 25, 2019, the Vaxart Board adopted Boyd's requested changes.  Defs. RSOF ¶ 58.  The Board thus consisted of Latour, Boyd, Maher, Yedid, Davis, Michael Finney, Anne VanLent, and Richard Markham.  Yedid Dep. at 25:21-25.  Markham left the Board in November 2019.  *Id.* at 25:12-16.  Andrei Floroiu later joined the Board in April 2020; he replaced Latour as chief executive officer of Vaxart in the first week of June 2020.  ECF No. 107-6 ("Floroiu Memo") at 2; ECF Nos. 107-2, 122-15 (together, "Latour Dep.") at 61:2-11.

On October 28, 2019, Vaxart filed a Form 8-K with the Securities and Exchange Commission (the "SEC").  JSOF ¶ 9.  The Form 8-K stated that the Board had "determined that each of Messrs. Davis and Yedid meet the requirements for independence under the

---

[2] Yedid testified in this case as Vaxart's representative witness under Rule 30(b)(6).  ECF No. 107 ¶ 3; *see Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 99 (S.D.N.Y. 2014) ("The testimony elicited at [a] Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponent[]." (citation omitted)).

applicable listing standards of The Nasdaq Stock Market LLC and the Securities Exchange Act of 1934." ECF No. 107-24 at 3. Conversely, the Board had "determined that Mr. Boyd and Dr. Maher are not independent by virtue of their positions with Armistice Capital, LLC which beneficially owns more than 50% of [Vaxart's] common stock." *Id.* Davis and Yedid would receive compensation in cash and equity, but Boyd and Maher would not, "in light of their positions with Armistice Capital." *Id.* Unlike Davis and Yedid, Boyd and Maher were not assigned to any committees upon their appointment. *See id.* at 4; Pl. RSOF ¶ 12.

Throughout Boyd and Maher's tenure on the Vaxart Board, their fellow directors understood that: (1) Armistice had invested in Vaxart; (2) Boyd and Maher were affiliated with Armistice; (3) Boyd and Maher had joined the Board because of Armistice's investments in Vaxart; (4) Boyd's position as chief investment officer of Armistice Capital allowed him to routinely influence Armistice's investment policy regarding Vaxart; (5) Boyd was the principal decisionmaker at Armistice regarding Armistice's Vaxart investment and any transactions in Vaxart securities; and (6) in addition to serving the interests of Vaxart, Boyd and Maher would take Armistice's interests into account when serving as Vaxart directors. Pl. RSOF ¶ 15. As directors of Vaxart, Boyd and Maher also had access to confidential and proprietary information. JSOF ¶ 11. Boyd states that, "[a]s Chief Investment Officer of Armistice Capital, [he] necessarily shared this confidential information with Armistice – indeed, such sharing amounted to simply receiving the information [him]self." Boyd Decl. ¶ 26.

According to Yedid (testifying as Vaxart's representative under Rule 30(b)(6)), the other members of the Board understood that Boyd and Maher "would be representing the Armistice interests on the Vaxart board" and "would take Armistice's interest into account while serving on the Vaxart board." Yedid Dep. at 78:22-79:22. In other words, the rest of

the Board "understood that Mr. Boyd was one of Armistice's representatives on the Vaxart board," that "Dr. Maher was one of those representatives" as well, that each of them was "an extension of Armistice," and that "sharing Vaxart information with [them] was the equivalent to sharing that information with Armistice." *Id.* at 94:18-95:22; *see also id.* at 127:21-129:9 (similar); *id.* at 212:22-213:4 ("it was understood" that Boyd and Maher "were representing Armistice Capital on the board").  Attestations by individual Board members are to the same effect: that they understood not only that Boyd and Maher were subject to potential conflicts of interest, but also that Boyd and Maher represented Armistice on the Board.  *See* ECF No. 107-4 ("Davis Memo") at 5 (Davis "knew Messrs. Boyd and Maher were not independent and were effectively insiders, with access to inside information at the Company, and therefore they had to manage their non-independence with their Board duties"; "of course" Davis "understood they were extensions of Armistice on the Board"); Finney Memo at 6 (Finney "knew that Mr. Boyd and Mr. Maher, by virtue of Armistice having owned so many Vaxart shares, had become members of the Board and were representing Armistice's interests"); Floroiu Memo at 6 ("as far as [Floroiu] understood, Messrs. Boyd and Maher were put on the Company's Board to represent Armistice's interests"; Floroiu and the other Board members "were generally aware that Messrs. Boyd and Maher were there to represent Armistice's interest and . . . no one ever expressed any other understanding"; "when Messrs. Boyd and Maher were in the room or a meeting, it was understood that Armistice was being represented"); ECF No. 107-8 ("VanLent Memo") at 4 (VanLent "had always understood" that Boyd and Maher "were representatives of Armistice," and she knew that "whenever the Company dealt with Messrs. Boyd and Maher, they were dealing with Armistice by doing so"; VanLent "knew Armistice controlled Messrs. Boyd and Maher and that because of that, they were extensions of Armistice on the Board").

Armistice's first transaction in Vaxart common stock in 2020 was on April 28, 2020. Pl. RSOF ¶ 23.  Between April 28, 2020, and June 3, 2020, Armistice sold 18,200,000 shares, representing a sale of about 72 percent of Armistice's holdings of Vaxart common stock as compared to its position at the end of 2019.  *Id.*  As of June 3, 2020, Armistice owned 7,000,000 shares of Vaxart common stock, constituting approximately 9.4 percent of outstanding shares.  *Id.* ¶ 24; JSOF ¶ 15.

On May 14, 2020, Boyd and Latour discussed amending the Warrants' blocker provisions.  JSOF ¶ 16; Latour Dep. at 35:17-36:4.  Sometime between May 15 and May 18, 2020, Maher called Yedid "to talk about the benefit of [amending] the blocker percentages."  Yedid Dep. at 106:22-107:3.

On May 28, 2020, Latour sent an email to an attorney at the law firm Thompson Hine LLP stating: "I spoke with Steve [Boyd].  I think he is comfortable with the 19.99% and doing the $1.10 first, at least he was on the phone.  The other items are less fleshed out.  Would be great to discuss briefly before I send this out."  ECF No. 122-31 at 2; *see* Yedid Dep. at 99:21-100:5 (identifying this attorney as counsel for Vaxart).  Later that day, Latour sent an email to VanLent, Finney, Davis, Yedid, and Floroiu – that is, the rest of the Board other than Boyd and Maher.  ECF No. 122-32.  Latour noted that "Armistice has a large number of warrants," "[a]ll warrants are subject to warrant blockers," and "Armistice has requested that we remove the blockers."  *Id.* at 2.  Latour proposed "set[ting] up a call for the disinterested Directors to discuss" the matter.  *Id.*

On May 31, 2020, Boyd spoke with Floroiu.  Defs. RSOF ¶ 75.  Boyd also sent an instant message to Floroiu (apparently after their conversation) stating: "Just so we're clear. We'd like the blocker increased to 19.9% or higher."  ECF No. 122-33 at 2.  Floroiu responded: "Got it."  *Id.*

The Board (excluding Boyd and Maher) held a call on June 1, 2020, to discuss Boyd's proposed removal of the Warrants' blocker provisions. Pl. RSOF ¶ 30. Boyd and Maher did not participate because of their positions with Armistice. *Id.* ¶ 31; Davis Memo at 5. During the call, the Board discussed "both the benefits to the company of . . . amending the warrant blockers, . . . as well as potential drawbacks." Yedid Dep. at 110:5-12. "Ultimately, [the Board] decided to increase the blocker threshold." *Id.* at 114:16-18. In doing so, the Board "took . . . into account" Boyd's position at Armistice and his influence over Armistice's investments in Vaxart. *Id.* at 130:22-132:4; *see also* Finney Memo at 5 (Finney "knew the warrant amendment transaction was with Armistice"); Floroiu Memo at 5-6 (Floroiu "understood Messrs. Boyd and Maher were not invited to participate in the June 1 teleconference because the Board was considering a transaction with Armistice and, as far as he understood, Messrs. Boyd and Maher were put on the Company's Board to represent Armistice's interests"); VanLent Memo at 4 (VanLent "understood the proposed amendment transaction was a transaction with Armistice"; "she 'never missed that point' and that the Company was doing that transaction with Armistice through Messrs. Boyd and Maher as Armistice's representatives, which is why they were not included in the Board's discussions about the amendment transaction").

On June 5, 2020, the Vaxart Board approved amendments to the Warrants (the "Amendments") through a unanimous written consent executed by all eight directors. JSOF ¶ 21; ECF No. 107-17. The unanimous written consent contained several "whereas" clauses, including:

> WHEREAS, the interests of Steven Boyd and Keith Maher, M.D., who are members of the Board and affiliates of Armistice Capital, such that Mr. Boyd and Dr. Maher each may be considered an Interested Party and the Warrant Amendments

> may be considered Interested Party Transactions, have been
> fully disclosed to all members of the Board; and
>
> WHEREAS, the members of the Board that are not Interested
> Parties evaluated the material facts of the relationships and/or
> interests of the Interested Parties with and in the Company
> during a telephonic meeting held on June 1, 2020, and each of
> the members of the Board is aware of the material facts of the
> relationships and/or interests of the Interested Parties with and
> in the Company, and has had an adequate opportunity to ask
> questions regarding, and investigate the nature of such
> relationships and interests as they relate to the transactions
> described herein.

ECF No. 107-17 at 5 (emphasis omitted); *see also id.* at 4 (defining "Interested Party" and

"Interested Party Transaction" (emphasis omitted)).  The Amendments increased the

beneficial-ownership thresholds in the Warrants' blocker provisions to 19.99 percent.  JSOF

¶ 23.  The Amendments also eliminated Armistice's right to increase the blocker percentage

threshold on 60 days' notice.  Pl. RSOF ¶ 36.  On June 7, 2020, Latour sent Armistice signed

copies of the Amendments, which Armistice countersigned on June 8, 2020.  JSOF ¶ 22; Defs.

RSOF ¶ 74.

     Before trading commenced on June 26, 2020, Armistice owned 7,000,000 shares of

Vaxart common stock, constituting about 9.4 percent of Vaxart's outstanding shares.  Pl.

RSOF ¶ 42; Boyd Decl. ¶ 13.  That day, Vaxart "announced that its oral COVID-19 vaccine

ha[d] been selected to participate in a non-human primate (NHP) challenge study" sponsored

by the federal government.  ECF No. 122-1 at 2.  Following this announcement, on June 26

and 29, 2020, Armistice exercised the Warrants for 16,666,667 and 4,090,909 shares,

respectively, at prices of $0.30 and $1.10 per share.  Defs. RSOF ¶ 80.  On those same days,

Armistice sold 27,612,053 shares of Vaxart common stock; 20,612,053 of these shares were

shares that Armistice received after exercising the Warrants.  *Id.* ¶ 83.  In sum, through these

transactions, Armistice liquidated virtually all of its Vaxart holdings.  *Id.* ¶ 56.

## II. Procedural History

Plaintiff filed suit on October 23, 2020.  Compl.  Plaintiff identified himself as a New York resident and owner of Vaxart common stock.  *Id.* ¶ 2.  In the Complaint, Plaintiff claimed that the Amendments approved on June 8, 2020, were sufficiently "material amendments" as to "constitute the grant of new warrants and cancellation of the prior warrants," thus qualifying as purchases for purposes of Section 16(b).  *Id.* ¶¶ 32-33.  Plaintiff also alleged that "Defendants realized short-swing profits of at least $87,121,800 resulting from the [Amendments] on June 8, 2020 of 9,403,510 shares at the purchase price of $2.39 per share, and [the sale of] these shares on June 26 and 29."  *Id.* ¶ 37.  Plaintiff's two-count Complaint sought disgorgement of these short-swing profits on behalf of Vaxart.  *Id.* ¶¶ 42-43, 48-50.  Defendants unsuccessfully moved to dismiss the Complaint.  *See generally Roth v. Armistice Cap., LLC*, No. 20-cv-08872 (AT), 2022 WL 912942 (S.D.N.Y. Mar. 29, 2022), *reconsideration denied*, 2022 WL 4063897 (S.D.N.Y. Sept. 2, 2022).  Defendants answered the Complaint on April 19, 2022.  Ans.  On September 16, 2022, the case was reassigned to the undersigned.

In a letter filed on May 9, 2023, Defendants reported that the parties had completed discovery.  ECF No. 95 at 1.  Defendants informed the Court that they intended to move for summary judgment, as well as move to dismiss "on the ground that Plaintiff lacks constitutional standing and, therefore, the Court lacks subject matter jurisdiction over this proceeding."  *Id.* at 2 (relying on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); and *Packer ex rel. 1-800 Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 661 F. Supp. 3d 3 (E.D.N.Y.), *appeal docketed*, No. 23-367 (2d Cir. Mar. 15, 2023)).  Plaintiff countered that he has standing.  ECF No. 96 at 1.  The Court set a briefing schedule for any motion to dismiss and/or motion for summary judgment filed by Defendants.  ECF No. 97.

On June 1, 2023, Defendants moved for summary judgment.  Br.; ECF Nos. 107-108 (declarations); Boyd Decl.; ECF No. 110 (declaration); JSOF; ECF No. 112 ("DSOF"). Plaintiff filed his opposition on June 29, 2023.  ECF No. 118 ("Opp."); Pl. RSOF; ECF No. 120 ("PSOF"); ECF Nos. 121-123 (declarations).  Defendants filed their reply on July 19, 2023.  ECF No. 125 ("Reply"); ECF No. 126 (declaration); Defs. RSOF; *see also* ECF Nos. 130-133 (parties' letters regarding supplemental authority).

The parties requested oral argument through notations on their briefs.  In a letter filed simultaneously with their motion for summary judgment, Defendants reiterated their request for oral argument.  ECF No. 113 at 1.  Defendants also informed the Court that, "[i]n the interests of preserving both judicial and party resources," Defendants had decided to "defer" filing a motion to dismiss for lack of standing "until after the Second Circuit resolves the pending appeal in *Packer*."  *Id.*

On February 20, 2024, the Court ordered the parties to "file a joint letter addressing whether this case should be stayed pending the Second Circuit's decision in *Packer*," noting that "Article III standing is a threshold jurisdictional matter in every case and the Court cannot address the merits of the case before confirming that Plaintiff has standing."  ECF No. 134 at 1.  The parties submitted a joint letter on February 23, 2024, expressing their "differing views" on the matter.  ECF No. 135 at 1.  Defendants argued that the case should be stayed. *See id.*  Plaintiff disagreed.  *See id.* at 4.  The letter brief also provided the parties' positions and supporting legal authority on the question of whether Plaintiff has standing.  *See generally id.*  On February 26, 2024, the Court declined to stay the action and set oral argument for March 19, 2024.  ECF No. 136 at 1.  At a lengthy oral argument, the parties addressed Article III standing as well as the merits of Defendants' motion for summary judgment.  *See generally* Mar. 19, 2024 Oral Arg. Tr.

## LEGAL STANDARD

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

"In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that sets forth specific facts showing a genuinely disputed factual issue that is material under the applicable legal principles."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (brackets, quotation marks, and citation omitted).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252. "And [al]though, at the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party, that is true only if there is a genuine dispute as to those facts.  If a [nonmoving party's] denial of [a fact] is blatantly contradicted by the record, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (original brackets, quotation marks, and citation omitted).

## DISCUSSION

As explained, Plaintiff (suing on Vaxart's behalf) seeks to disgorge the profits that Defendants earned through their sales of Vaxart stock on June 26 and June 29, 2020.  In their

motion for summary judgment, Defendants argue that: (1) the Amendments did not constitute purchases for purposes of Section 16(b), and thus the sales on June 26 and 29, 2020 were not within six months of a purchase; and (2) even if the Amendments qualified as purchases, Defendants were exempted from Section 16(b) liability under 17 C.F.R. § 240.16b-3(d) ("Rule 16b-3(d)").  After providing an introductory overview of Section 16(b) and Rule 16b-3(d), the Court confirms that Plaintiff has Article III standing and then turns to the merits.

## I.    Overview of Section 16(b) and Rule 16b-3(d)

"Section 16(b) imposes a strict prophylactic rule with respect to insider, short-swing trading." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976).  Under Section 16(b), "a corporation or security holder of that corporation may bring suit against the officers, directors, and certain beneficial owners of the corporation who realize any profits from the purchase and sale, or sale and purchase, of the corporation's securities within any 6-month period." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 223 (2012) (footnote omitted).  "The statute imposes a form of strict liability and requires insiders to disgorge these short-swing profits even if they did not trade on inside information or intend to profit on the basis of such information." *Id.* (quotation marks and citation omitted).

Generally, a plaintiff suing under Section 16(b) need only establish that "there was (1) a purchase and (2) a sale of securities (3) by an insider (4) within a six-month period." *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (brackets and citation omitted).  The category of "insiders" under Section 16(b) includes "directors by deputization." *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 244 (2d Cir. 2008) (citing *Blau v. Lehman*, 368 U.S. 403, 409-10 (1962)), *aff'g* No. 05-cv-10466 (RPP), 2006 WL 2129331 (S.D.N.Y. July 31, 2006).  Under the director-by-deputization theory, "an investor becomes a statutory insider when it deputizes an individual to serve as its representative on an issuer's

board of directors." *Rubenstein v. Int'l Value Advisors, LLC*, 959 F.3d 541, 550 (2d Cir. 2020).  In *Blau*, the Supreme Court "intimated that the issue of deputization is a question of fact to be settled case by case and not a conclusion of law."  *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969) (citing 368 U.S. at 408-09); *accord Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 53 (2d Cir. 2012).

Section 16(b) also provides that it "shall not be construed to cover" any transaction "which the Commission by rules and regulations may exempt as not comprehended within the purpose of" Section 16(b).  15 U.S.C. § 78p(b).  One such regulation is Rule 16b-3(d), which "exempts from Section 16(b)'s coverage directors' and officers' board-approved acquisition[s] of securities directly from issuers."  *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 219 (2d Cir. 2012).  As the SEC has explained, the rationale for Rule 16b-3(d) is that "where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute."  Ownership Reports and Trading by Officers, Directors and Principal Security Holders, 61 Fed. Reg. 30376, 30377 (June 14, 1996) ("1996 Release") (to be codified at 17 C.F.R. pts. 228, 229, 240, and 249).  Rule 16b-3(d) applies if three conditions are met: (1) the transaction "involve[s] the defendant acquiring issuer equity securities from the issuer"; (2) the defendant is "a director or officer of the issuer at the time of the transaction"; and (3) the transaction is "approved in advance by the issuer's board of directors."  *Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 141 (2d Cir. 2002). Under Second Circuit precedent, the category of directors covered by Rule 16b-3(d) includes directors by deputization.  *See Perseus*, 522 F.3d at 246-47.

## II.  Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"  *TransUnion*, 594 U.S. at 423.  "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quotation marks and citation omitted).  "[T]he irreducible constitutional minimum of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks and citation omitted).

Although Defendants indicated a preference for deferring the question of standing until after the resolution of their summary-judgment motion (and thus waiting until the Second Circuit ruled in *Packer*), the Court cannot do so.  Article III standing is a "threshold jurisdictional question" in every case, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), and a federal court may not address the merits before confirming that the plaintiff has "standing for each claim that [he] press[es] and for each form of relief that [he] seek[s]," *TransUnion*, 594 U.S. at 431.  Thus, the Court has "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

The Court's analysis begins with *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170 (2d Cir. 2012).  There, the plaintiff was a shareholder in a company; the defendant was a statutory insider at that company under Section 16(b).  *See id.* at 172-73.  The defendant "concede[d] that § 16(b) prohibited it . . . from engaging in any short-swing trading, [but] it submit[ted] that in the absence of further wrongdoing, [a] plaintiff cannot claim any cognizable injury resulting from that trading."  *Id.* at 172.  The Second Circuit "reject[ed]

[this] argument as without merit." *Id.* at 176.  Analogizing to the common law of trusts, the

Second Circuit explained that Section 16(b) "confer[s] on securities issuers a legal right, one

that makes [statutory insiders] constructive trustee[s] of the corporation, with a fiduciary duty

not to engage in short-swing trading of the issuer's stock." *Id.* at 179 (third alteration in

original; quotation marks and citation omitted).  "That fiduciary duty [i]s created by § 16(b),

and it confer[s] upon [the issuer] an enforceable legal right to expect [the statutory insider] to

refrain from engaging in any short-swing trading in its stock.  The deprivation of this right

establishes Article III standing." *Id.* at 177.  In short, Congress "created legal rights that

clarified the injury that would support standing, specifically, the breach by a statutory insider

of a fiduciary duty owed to the issuer not to engage in and profit from any short-swing trading

of its stock." *Id.* at 180.

Several years later, the Supreme Court held that, when determining whether a plaintiff

has standing, "courts should assess whether the alleged injury to the plaintiff has a 'close

relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in

American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S. at 341).  "That

inquiry asks whether plaintiffs have identified a close historical or common-law analogue for

their asserted injury," although it "does not require an exact duplicate in American history and

tradition." *Id.*  "Importantly, [the Supreme Court] has rejected the proposition that 'a plaintiff

automatically satisfies the injury-in-fact requirement whenever a statute grants a person a

statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* at 426

(quoting *Spokeo*, 578 U.S. at 341).  "Congress may elevate to the status of legally cognizable

injuries concrete, *de facto* injuries that were previously inadequate in law," but it "may not

simply enact an injury into existence, using its lawmaking power to transform something that

is not remotely harmful into something that is." *Id.* at 425-26 (quotation marks and citations

omitted).  In short, "under Article III, an injury in law is not an injury in fact.  Only those

plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that

private defendant over that violation in federal court."  *Id.* at 427.

*TransUnion* involved thousands of plaintiffs bringing a class action against a credit-

reporting agency under the Fair Credit Reporting Act (the "FCRA").  *See id.* at 417.  The

plaintiffs' main claim was that the defendant "failed to use reasonable procedures to ensure

the accuracy of their credit files, as maintained internally by [the defendant].  For 1,853 of the

class members, [the defendant] provided misleading credit reports to third-party businesses."

*Id.*  "The internal credit files of the other 6,332 class members were *not* provided to third-

party businesses during the relevant time period."  *Id.*  The Supreme Court held that the 1,853-

plaintiff group had alleged an "injury bear[ing] a close relationship to a harm traditionally

recognized as providing a basis for a lawsuit in American courts – namely, the reputational

harm associated with the tort of defamation."  *Id.* at 432 (quotation marks and citation

omitted).  But the 6,332 class members whose internal credit files were not provided to third-

party businesses "did not suffer a concrete harm" and thus lacked Article III standing.  *Id.* at

439.

Although the full extent of its impact remains to be seen, *TransUnion* appears to have

"narrowed the grounds for asserting standing where the injury is primarily statutory."

*Faehner v. Webcollex, LLC*, No. 21-1734, 2022 WL 500454, at *1 (2d Cir. Feb. 18, 2022)

(summary order).  In its wake, courts have grappled with whether prior decisions on standing

are compatible with *TransUnion*'s analytical framework.  *See, e.g.*, *Maddox v. Bank of N.Y.*

*Mellon Tr. Co.*, 19 F.4th 58, 60-62 (2d Cir. 2021) (withdrawing pre-*TransUnion* opinion

confirming standing and replacing it with new opinion denying standing).  In the first post-

*TransUnion* opinion addressing *Bulldog*'s continuing vitality, *Packer* held that *TransUnion*

abrogated *Bulldog*: "*Bulldog*'s grant of standing once a violation of Section 16(b) is alleged, without a showing of concrete harm beyond that violation, must yield to the principles announced in *TransUnion*.  Here, Plaintiff fails to point to or articulate any actual reputational harm to [the issuer] flowing from Defendants' breach of Section 16(b).  Plaintiff's argument that a violation of Section of 16(b) caused reputational harm, even if said violation went unnoticed by all, cannot support Article III standing."  661 F. Supp. 3d at 14.

Defendants invoke *Packer* and contend that, following *TransUnion*, *Bulldog* is no longer good law.  *See* ECF No. 135 at 3.  The Court disagrees.  "Generally, a published decision by the Second Circuit binds future panels and district courts within the Circuit unless the decision is overruled by the *en banc* Second Circuit or by the Supreme Court."  *United States v. Fayton*, --- F. Supp. 3d ----, 2023 WL 8275924, at *3 (S.D.N.Y. Nov. 30, 2023).  "To be sure, this rule does not apply when an intervening Supreme Court decision casts doubt on a controlling Second Circuit precedent."  *Id.* (brackets, quotation marks, and citation omitted).  "But the intervening-decision exception is confined to situations where there is a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision."  *Id.* (quotation marks and citation omitted).

*Bulldog* and *TransUnion* are not conflicting, incompatible, or inconsistent.  "Just as the Supreme Court did in *TransUnion*, the Second Circuit in *Bulldog* analyzed the harm suffered by a § 16(b) plaintiff and reasoned that it was akin to the common law injury of breach of trust arising from the [statutory insider's] fiduciary duty to the issuer."  *Avalon Holdings Corp. v. Gentile*, Nos. 18-cv-07291, 18-cv-08896 (DLC), 2023 WL 4744072, at *6 (S.D.N.Y. July 25, 2023); *accord Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1060-61 (2d Cir. 1974) (further developing the analogy between Section 16(b) and the law of trusts); *Gratz v. Claughton*, 187 F.2d 46, 49-50 (2d Cir. 1951) (L. Hand, J.) (same).  "This traditional

breach of trust is different from *TransUnion*'s examples of non-concrete claims: a resident of

Hawaii suing for pollution in Maine where the violation did not personally harm the plaintiff

in Hawaii; damages claims over misleading credit files where the files were never given to

any creditor; and damages claims based on disclosures that were formatted incorrectly, when

the formatting caused no harm and no information was withheld." *Augenbaum v. Anson Invs.*

*Master Fund LP*, No. 22-cv-00249 (AS), 2024 WL 263208, at *5 (S.D.N.Y. Jan. 24, 2024)

(brackets, quotation marks, and citations omitted). "As the Court in *TransUnion* observed,

those claims had no common-law analogues," unlike the breach-of-trust injury invoked in

*Bulldog*. *Id.*; *accord Microbot Med., Inc. v. Mona*, No. 19-cv-03782 (GBD) (RWL), 2024

WL 564176, at *6 (S.D.N.Y. Jan. 30, 2024) ("A claim under § 16(b) is markedly different

than claims under other statutes for which the courts, such as *TransUnion*, have found lack of

standing."), *report and recommendation adopted*, 2024 WL 964594, at *5 (S.D.N.Y. Mar. 5,

2024) ("Far from transforming something that is not remotely harmful into something that is,

§ 16(b) recognizes an injury that has well-established historical roots grounded in the common

law." (brackets, quotation marks, and citations omitted)); *Revive Inv. LLC v. Armistice Cap.*

*Master Fund, Ltd.*, No. 20-cv-02849, 2023 WL 5333768, at *7 (D. Colo. Aug. 18, 2023)

("[T]he law of trusts analogized to in *Bulldog* is deeply rooted in the common law.").[3]

---

[3] Even if one were to insist on a "close historical or common-law analogue" for a *derivative* action under Section 16(b), the Court notes that shareholder suits are well established "in American history and tradition." *TransUnion*, 594 U.S. at 424; *see* Donna I. Dennis, *Contrivance and Collusion: The Corporate Origins of Shareholder Derivative Litigation in the United States*, 67 Rutgers U. L. Rev. 1479, 1481 (2015) ("Commentators have generally identified *Robinson v. Smith*, [3 Paige Ch. 222 (N.Y. Ch. 1832)], as the first case to clearly recognize a right by minority shareholders to pursue a derivative suit against miscreant corporate officers and directors."); *Dodge v. Woolsey*, 59 U.S. (1 How.) 331, 341 (1855) ("It is now no longer doubted, either in England or the United States, that courts of equity, in both, have a jurisdiction over corporations, at the instance of one or more of their members; to apply preventive remedies by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their

Therefore, the Court joins the other courts in the Southern District to consider the issue post-*TransUnion* in holding that *Bulldog* remains good law, and that derivative plaintiffs have Article III standing to bring claims under Section 16(b).  *See Avalon*, 2023 WL 4744072, at *6 ("*Bulldog* . . . is entirely compatible with *TransUnion*."); *Augenbaum*, 2024 WL 263208, at *4 ("*Bulldog*'s reasoning is consistent with *TransUnion*."); *Microbot*, 2024 WL 964594, at *4 ("Plaintiff has standing in this case for reasons set forth in *Bulldog*, *Avalon*, and *Revive*." (quotation marks and citation omitted)).

The Court is not persuaded by the standing analysis in *Packer*.  *TransUnion* stated that "intangible harms can also be concrete.  Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.  Those include, *for example*, reputational harms, disclosure of private information, and intrusion upon seclusion."  594 U.S. at 425 (citation omitted; emphasis added).  The examples highlighted by the Supreme Court were harms comparable to those underlying the plaintiffs' theories under the FCRA.  *See id.* at 417 (describing "reputational harm" and the intangible harm that was "relevant [t]here").  But *TransUnion* did not hold that these examples were the *only* intangible harms that could qualify as concrete.  A breach of trust, by itself, is a concrete intangible injury.  Indeed, proof of damages or other harm beyond a breach of trust is generally not required to obtain disgorgement for such a breach.  *See, e.g.*, *Kahn v. Kolberg Kravis Roberts & Co.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the

---

capitals or profits, which might result in lessening the dividends of stockholders, or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in the law denominated a breach of trust."); *see also, e.g.*, *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 67 n.5 (2d Cir. 2013) ("LIHS and the Class have asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties.  This is injury-in-fact sufficient for constitutional standing.").

fiduciary to profit from using confidential corporate information.  Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); *Diamond v. Oreamuno*, 248 N.E.2d 910, 912 (N.Y. 1969) ("It is true that the complaint before us does not contain any allegation of damages to the corporation but this has never been considered to be an essential requirement for a cause of action founded on a breach of fiduciary duty.").  A breach of trust is therefore an intangible harm that suffices for Article III standing both before and after *TransUnion*.

Given the lack of conflict, incompatibility, or inconsistency between *Bulldog* and *TransUnion*, the Court follows *Bulldog* and holds that Plaintiff has standing to sue under Section 16(b).

### III.  Merits

Turning to the merits, Defendants make two arguments in favor of summary judgment.  First, Defendants contend that "they did not engage in 'matching' purchases and sales" within a six-month period, and that the Amendments do not qualify as purchases.  Br. at 1; *see id.* at 13-18; Reply at 9-10.  Second, Defendants argue that "even if the Amendments *could* be considered acquisitions of newly issued securities for Section 16(b) purposes," Defendants "are still not liable under Section 16(b) because the 'acquisitions' at issue are exempt under SEC Rule 16b-3."  Br. at 3; *see id.* at 18-25; Reply at 3-9.  The Court need not address Defendants' first point because it agrees with them on the second.

As noted, Rule 16b-3(d) exempts transactions where: (1) the defendant acquires the issuer's equity securities from the issuer; (2) the defendant is an officer or director (including a director by deputization) of the issuer at the time of the transaction; and (3) the issuer's board of directors approves the transaction in advance.  *See Perseus*, 522 F.3d at 246-47;

*Gryl*, 298 F.3d at 141.  The parties agree that the relevant transaction in this case is the adoption of the Amendments.  *See, e.g.*, Br. at 20; Opp. at 2.

It is undisputed that "the Amendments were undertaken directly with Vaxart."  Br. at 3; *accord* Opp. at 2 ("Vaxart agreed to amend the Warrants to increase the Conversion Caps in both Warrants to 19.99%."); JSOF ¶ 21 ("On June 5, 2020, the Board approved [the Amendments] through a Unanimous Written Consent.").  It is also undisputed that, at the time of the Amendments' adoption, Boyd was a Vaxart director and Armistice was a Vaxart director by deputization (via Boyd and Maher).  *See* ECF No. 107-17 at 7 (the unanimous written consent to the Amendments lists Boyd and Maher as directors); Defs. RSOF ¶ 52 ("Defendants do not dispute that they were directors by deputization by virtue of Mr. Boyd and Dr. Maher's representation of Armistice on the Vaxart Board, from the time of their appointment to the Board on October 25, 2019 until their resignation on January 28, 2021."); Opp. at 7 ("Armistice was an undisclosed director by deputization." (quotation marks omitted)).[4]  It is further undisputed that the Vaxart Board approved the Amendments.  JSOF

---

[4] Even if the parties did not agree that Armistice was a director by deputization, the evidence in the record would compel such a conclusion.  Courts consider various factors "in determining whether deputization has occurred," including: (1) "[w]hether the shareholding entity recommended the director for election or appointment to the board"; (2) "[w]hether the shareholding entity recommended the director for the purpose of protecting or representing the entity's interests rather than for the purpose of guiding or enhancing the issuer's business activities"; (3) "[w]hether the director regularly gained access to material nonpublic information about the issuer"; (4) "[w]hether the director shared the confidential information with the shareholding entity"; and (5) "[w]hether the shareholding entity used the information to inform its investment strategy regarding the issuer's securities."  *Calenture, LLC v. Pulte*, No. 21-cv-00402 (PKC), 2022 WL 912947, at *3-4 (S.D.N.Y. Mar. 29, 2022); *accord Perseus*, 2006 WL 2129331, at *9 (emphasizing similar facts in holding that "the [d]efendants' directors on [the issuer's] Board were functioning as deputies of [the defendants] consistent with the doctrine of deputization developed in *Feder*").  Given the undisputed facts set forth earlier in this opinion, Armistice plainly qualified as a director by deputization of Vaxart at the time the Board adopted the Amendments.

¶ 21.  Hence, all three requirements for the Rule 16b-3(d) exemption that the Second Circuit identified in *Gryl* are satisfied.  *See* 298 F.3d at 141.

Plaintiff argues, however, that the Rule 16b-3(d) exemption "is predicated upon an issuer's board having knowledge that the party with whom it is dealing is a director/director by deputization, so that it can perform its gate-keeping function and assure accountability that the transactions it approves are for a legitimate corporate purpose."  Opp. at 4.  According to Plaintiff, "Defendants failed to notify Vaxart of Armistice's intent to assume director status," and Vaxart "had no knowledge of Armistice's director status."  *Id.* at 7.  Plaintiff states that Armistice was therefore "an '*undisclosed* director by deputization'" and thus was "not entitled to the exemption."  *Id.* at 4 (emphasis added).

Plaintiff's theory relies principally on an amicus brief submitted by the SEC in *Dreiling v. American Express Co.*, 458 F.3d 942 (9th Cir. 2006), *see* ECF No. 122-3 (the "Amicus Brief" or "Amicus Br.").  Although Defendants disagree with Plaintiff's argument more generally, they agree with Plaintiff that the Court should consider the Amicus Brief; indeed, Defendants submitted it as an exhibit in support of their motion for summary judgment, *see* ECF No. 107-30, and they favorably cite it in their papers, *see* Br. at 19; Reply at 5.  The Court likewise believes that it should consider the SEC's views on Rule 16b-3(d) as stated in the Amicus Brief.[5]

---

[5] The Second Circuit has often stated that courts "must defer to the SEC's interpretations of its own regulations in its amicus briefs unless they are plainly erroneous or inconsistent with the regulations."  *Gryl*, 298 F.3d at 145; *see also, e.g.*, *Perseus*, 522 F.3d at 247; *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 207 (2d Cir. 2006); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir. 2000).  More recently, however, the Supreme Court has stated that the "general rule" is that courts should "not to give deference to agency interpretations [of regulations] advanced for the first time in legal briefs," although the practice is "not entirely foreclosed."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.6 (2019).  Here, the SEC submitted the relevant legal brief almost 19 years ago.  *See* Amicus Br. at 27 (dated April 5, 2005).  Thus, the concerns motivating *Kisor*'s "general rule," 139 S. Ct. at 2417 n.6 –

*Dreiling*, like the case at bar, involved a corporate short-swing seller seeking to rely on Rule 16b-3(d) under a director-by-deputization theory.  *See* 458 F.3d at 945.  In the Amicus Brief, the SEC defended its authority to promulgate Rule 16b-3(d) and contended that the rule encompasses directors by deputization.  *See* Amicus Br. at 21-25; *see also* Brief of SEC at 21-27, *Perseus*, 522 F.3d 242 (No. 06-3771), 2007 WL 6370271 (reiterating this argument); *Perseus*, 522 F.3d at 247-48 (deferring to this interpretation).  The SEC added, however, that "board or shareholder approval is not effective as a gatekeeping provision where the members of the board or shareholders are unaware that a person acquiring stock . . . is a director." Amicus Br. at 25.  It explained:

> If in this case, other members of the board did not know that [the board member] had been deputized to represent the interest of [the short-swing seller] on the [issuer's] board, as claimed by [the plaintiff], then the board would have no way of knowing that [the short-swing seller] was a director and that [the short-swing seller], through [the board member], had access to inside information.  As such, the other members of the board of [the issuer] would have no reason for special vigilance as to the acquisition of [the issuer's] stock by [the short-swing seller], and the board would not effectively serve its gatekeeping function and ensure accountability.  It is, therefore, imperative, for the purposes of Rule 16b-3(d), that the members of any corporate board know when another person serving on the same board is deputized by another person or entity to carry out its interests.  Whether the board had such knowledge [in this case] is a question of fact as to which the parties dispute, and as to which the Commission expresses no view.

*Id.* at 26.

---

including that an argument in a brief might be "a merely convenient litigating position," *id.* at 2417 (quotation marks and citation omitted), and that deferring to an agency's brief could create an "unfair surprise" for a regulated party, *id.* at 2418 (citation omitted) – are absent. Moreover, even if the Court is not required to defer to the Amicus Brief, the Court may still consider it to the extent that it has "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *accord Perine v. William Norton & Co.*, 509 F.2d 114, 120 (2d Cir. 1974) (SEC amicus brief's interpretation of a different regulatory exception to Section 16(b), "although informal, should be given considerable weight").

Plaintiff focuses on the SEC's statement that an issuer's board must "know that [the board member] had been deputized to represent the interest of [the short-swing seller] on the [issuer's] board." *Id.* From this sentence in an amicus brief primarily dealing with the validity of the Rule and its application to directors by deputization generally, Plaintiff extracts the rule that, to take advantage of the Rule 16b-3(d) exemption, the issuer's board must have "knowledge of [the shareholder's] director status," and the shareholder must formally "notify [the issuer] of [the] intent to assume director status." Opp. at 7; *see also, e.g.*, *id.* at 4 ("Armistice is not entitled to a director exemption because it did not structure its relationship with Vaxart to make of record its director status and assume associated fiduciary obligations to the Company. Armistice first acknowledged that it was a director by deputization in this litigation. Defendants' litigation strategy does not retroactively provide Vaxart's board with knowledge of Armistice's director status at the time of the Amendments."); *id.* at 12 ("While the board understood Boyd and Maher's positions with Armistice and that Armistice was a large shareholder, the board did not understand that Armistice was a director by deputization and, therefore, did not discuss the implications of Armistice being a director when they approved the Warrant Amendments." (citation omitted)); *id.* at 20-21 ("[T]he Vaxart board was not aware that Armistice deputized Boyd and had director by deputization status on the Vaxart board."). In Plaintiff's view, a "board's knowledge of the designation is not a mere formality," but rather "a prerequisite to establishing entitlement to an exemption under the Rule." *Id.* at 21.

The Court does not share Plaintiff's interpretation of the Amicus Brief (or of the record in this case). A legal brief, like a judicial opinion, "is not always to be parsed as though [one] were dealing with [the] language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). The Amicus Brief's reference to knowing that a director "had been

deputized," Amicus Br. at 26, must be read in context and should not be construed as requiring that other members of the board comprehend the legal concept of being a "director by deputization" and specifically conceive of the short-swing seller as so qualifying.  The Amicus Brief is better understood as simply requiring that, for the board to "effectively serve its gatekeeping function," "ensure accountability," and exercise "special vigilance as to the acquisition of [the issuer's] stock by [the short-swing seller]," the board must know that the relevant board member sits on behalf of, and represents the interests of, the short-swing seller.  *Id.*  To perform their fiduciary duties, an issuer's board members need not know that someone "ha[s] been deputized" in any formal, legalistic sense.  *Id.*  Instead, the issuer's board must understand the *reality* that one of its members functions as the short-swing seller's eyes, ears, voice, and vote.  There is no indication that more is required under Rule 16b-3(d).

*Gryl*'s reasoning is instructive.  In that case, the Second Circuit rejected as "wholly unpersuasive" the position that a board's approval of a transaction must be accompanied by "an express indication that its approval was intended to invoke the exemption."  298 F.3d at 144-45.  The Second Circuit emphasized that "the text of [Rule 16b-3(d)] itself contains no suggestion that such a requirement exists.  In fact, the rule focuses singularly and objectively on requiring that the terms and conditions of the transaction receive board approval; it mentions nothing about the subjective motivations of the approving body."  *Id.* at 145.  Moreover, such a requirement "would run counter to the very reason why [Rule 16b-3(d)] was established in the first place," *id.* – namely, to reflect the SEC's understanding that "where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute," and that such transactions thus "are not vehicles for the speculative abuse that section

16(b) was designed to prevent," *id.* (quoting 1996 Release at 30377).  The Second Circuit

therefore advised:

> So long as the relevant securities transaction is between an
> issuer and insider, and so long as the terms and conditions of
> that transaction receive advance approval by the board of
> directors, there exists sufficient protection to ensure that any
> short-swing profit taking that follows is not the result of unfair
> market manipulation.  Accordingly, we hold that a securities
> transaction need not receive purpose-specific approval in order
> to qualify for [the Rule 16b-3(d) exemption].

*Id.* at 145-46; *accord* Amicus Brief of SEC at 11-16, *Roth v. Foris Ventures, LLC*, 86 F.4th

832 (9th Cir. 2023) (Nos. 22-16632, 22-16633), 2023 WL 2088356 (arguing that the Ninth

Circuit should follow *Gryl*); *Foris*, 86 F.4th at 837 ("We find [*Gryl*'s] interpretation

persuasive and hold that Rule 16b-3 does not include a purpose-specific approval

requirement.").

      *Gryl* teaches that, in determining whether Rule 16b-3(d) applies, courts must hew to

the regulatory text and to the SEC's stated basis for instituting the exemption.  It is

understandable that, for there to be equal knowledge on both sides of a transaction, the issuer

must know that it is dealing with an entity that has people representing its interests on the

issuer's board.  That is the rationale for the requirement stated in the Amicus Brief.  But it is

far from clear how the further requirements advocated by Plaintiff – that the issuer's board

understand the legal notion of being a director by deputization and the related exemption, and

that the putative director by deputization expressly communicate its intent to qualify as such –

advance the substantive purposes underlying Section 16(b) and Rule 16b-3(d).  Absent such

an indication or a clear textual requirement, the Court declines to subject Defendants to

Section 16(b)'s "strong medicine."  *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125

(2d Cir. 2018).

Here, the evidence in the record plainly shows that the Board recognized and understood that Boyd and Maher represented Armistice on the Vaxart Board. Yedid, serving as Vaxart's Rule 30(b)(6) witness, testified that the Board understood that Boyd and Maher were "Armistice's representatives on the Vaxart board," that they were "extension[s] of Armistice," and that "sharing Vaxart information with [them] was the equivalent to sharing that information with Armistice." Yedid Dep. at 94:18-95:22. The submissions by other individual Board members corroborate Yedid's representative testimony. For example, Davis attests that he "knew Messrs. Boyd and Maher were not independent and were effectively insiders, with access to inside information at the Company," and that "of course" he understood that Boyd and Maher "were extensions of Armistice on the Board." Davis Memo at 5. Similarly, Finney "knew that Mr. Boyd and Mr. Maher, by virtue of Armistice having owned so many Vaxart shares, had become members of the Board and were representing Armistice's interests." Finney Memo at 6. Likewise, Floroiu attests that, "as far as he understood, Messrs. Boyd and Maher were put on the [Vaxart] Board to represent Armistice's interests," that "no one ever expressed any other understanding," and that "when Messrs. Boyd and Maher were in the room or a meeting, it was understood that Armistice was being represented." Floroiu Memo at 6. So too with VanLent, who "always understood" that Boyd and Maher "were representatives of Armistice," that "whenever [the other Board members] dealt with Messrs. Boyd and Maher, they were dealing with Armistice by doing so," that "Armistice controlled Messrs. Boyd and Maher," and that Boyd and Maher "were extensions of Armistice on the Board." VanLent Memo at 4.

The Court is not persuaded by Plaintiff's reliance on Yedid's testimony that the Board was not "aware of" and did not "discuss[]" the "concept" of Armistice being a director by deputization when it approved the Amendments. Yedid Dep. at 331:19-332:3. Similarly

unavailing is Plaintiff's reliance on Latour's testimony that he did not "understand that [Armistice] was an insider on the Vaxart board as a director by deputization," Latour Dep. at 72:1-13, or that when the Board approved the Amendments, Latour did not "understand that they were approving a transaction with a Vaxart director" in an official sense, *id.* at 74:11-24; *see id.* at 74:25-75:11 ("I don't know what ['exempting the warrant amendment transactions from liability under Section 16(b)'] means").  Instead, what matters is that, when it approved the transaction, the Vaxart Board "understood" that Boyd and Maher "were representing Armistice Capital on the board."  Yedid Dep. at 212:22-213:4.  Given the Board members' understanding that Boyd and Maher represented Armistice on the Board, that sharing confidential information with them was akin to sharing it with Armistice, and they were extensions of Armistice on the Board, no formal understanding of the director-by-deputization legal theory was necessary for the Board to "effectively serve its gatekeeping function," "ensure accountability," and exercise "special vigilance as to the acquisition of [Vaxart's] stock by [Armistice]."  Amicus Br. at 26.

The Court also sees no basis for requiring a prospective director by deputization "to notify [the issuer] of [the] intent to assume director status."  Opp. at 7.  The two treatises quoted by Plaintiff do not require a different conclusion.  *See id.* at 22 ("If the investor will consider itself a director by deputization, and expects to rely on Rule 16b-3 to exempt any future transactions with the issuer, the investor *should* seek the issuer's concurrence in its conclusion to assure that the issuer's board of directors will acknowledge the investor's status as a director by deputization in any resolutions approving a transaction between the investor and the issuer." (brackets and ellipsis omitted; emphasis added) (quoting Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* § 2.04[7] (5th ed. 2019))); *id.* ("The deputizing entity *should* have the issuer acknowledge in an email or in writing that the

deputized director is its designee." (emphasis added) (quoting Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* § 2:68 (Westlaw updated Feb. 2023))).  The treatises merely *recommend* that investors hoping to invoke Rule 16b-3(d) take certain precautionary steps to confirm the deputization.  *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) ("[T]he common meaning of 'should' suggests or recommends a course of action.").  That a secondary source recommends a best practice as advisable, however, does not mean that it is obligatory, and neither treatise opines that an investor is *required* "to notify [the issuer] of [the] intent to assume director status" in order to qualify for Rule 16b-3(d), Opp. at 7.  Indeed, such a requirement would be difficult to square with the Second Circuit's direction in *Gryl* that purpose-specific approval is not required for the Rule 16b-3(d) exemption to apply.  *See* 298 F.3d at 145-46.

Plaintiff's other efforts to manufacture material issues of fact are no more fruitful.  For instance, Plaintiff claims that certain documents, including press releases, meeting minutes, and SEC filings, "identify Boyd and Maher as directors in their individual capacities and do not disclose that Armistice deputized Boyd and Maher to serve on the board." *Id.* at 8.  The cited documents simply list the names of everyone on the Board, including Boyd and Maher. *See, e.g.*, ECF No. 122-17 at 3; ECF No. 122-22 at 13.  But the documents do not expressly identify Boyd and Maher as serving solely "in their individual capacities," as Plaintiff implies. Opp. at 8.  And Plaintiffs never explain how this handful of documents creates a genuine dispute of material fact about whether the Board understood that Boyd and Maher represented Armistice's interests on the Board, especially given all of the contrary evidence presented.

Plaintiff also points to several statements by Boyd vowing his commitment to Vaxart's success.  *See* Opp. at 8 ("In an email message dated October 9, 2019, Boyd introduced Latour to Davis and Yedid and advised that he and Latour 'are excited to work together to create

shareholder value from the Company's rich asset base.'"); *id.* ("In Vaxart's October 28, 2019 press release announcing the new board members, . . . Boyd stated: 'The new board members and I are committed to realizing the vast potential of the Company's differentiated portfolio of assets for the benefit of all shareholders.'"); *id.* at 9 ("Boyd testified in his deposition that he became a Vaxart board member 'to play a role in shaping the strategy of the company to try to benefit, frankly, all shareholders.'"). Yet Plaintiff gives no reason to believe that these generic expressions of commitment to boosting the performance of Vaxart are inconsistent with the Board perceiving Boyd and Maher as also functioning as Armistice's representatives.[6]

In sum, Defendants have established their entitlement to Rule 16b-3(d)'s exemption to liability under Section 16(b) and, therefore, to summary judgment.

---

[6] Plaintiff also points to a conflict questionnaire that Latour sent to Boyd on October 8, 2019. *See* Opp. at 8. In the questionnaire, Boyd affirmed that he had "not been selected . . . as a . . . nominee to become a director of the Company pursuant to any arrangement or understanding between myself and any other person or persons (other than directors or officers of the Company acting solely in their capacities as such)." ECF No. 122-18 at 9 (emphasis omitted). Boyd also affirmed that he did "not have a relationship of any kind . . . with any entity organization that has a relationship with the Company . . . which relationship could interfere with my exercise of independent judgment in carrying out my responsibilities as a director of the Company." *Id.* at 11. Regardless of how they could be construed in a vacuum, these responses to a conflict questionnaire evidently did not alter the Vaxart Board members' clear understanding (reflected in their testimony) that Boyd and Maher served as Armistice's representatives on the Board.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 105 and CLOSE the case.

Dated: March 27, 2024
       New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge